UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:11-CR-42 |
| v. | ) | |
| | ) | Collier/Lee |
| AUGUST ANTHONY FORD | ) | |

## M E M O R A N D U M

Defendant August Anthony Ford ("Defendant") filed two motions to suppress evidence in this case (Court File Nos. 41, 59). The first motion sought to suppress evidence from a 2009 traffic stop, including his confession to being a felon in possession of a firearm (Court File No. 41). His second motion sought suppression of evidence flowing from the placement of a Global Positioning System ("GPS") tracking device on his vehicle (Court File No. 59). These motions were referred to United States Magistrate Judge Susan K. Lee, who held a hearing and subsequently filed a Report and Recommendation ("R&R") concluding Defendant's motions should be denied (Court File No. 70). Defendant timely objected (Court File No. 71). The government responded to Defendant's objections (Court File No. 73). For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 70). Accordingly, Defendant's motions to suppress will be **DENIED** (Court File Nos. 41, 59).

## I.     RELEVANT FACTS

Defendant does not challenge the Magistrate Judge's account of the testimony and evidence presented at the hearing, which the Court hereby adopts by reference (Court File No. 70, pp. 1-9). The Court will only briefly summarize the testimony and evidence necessary to this Memorandum.

On April 14, 2009, Officer Mike Patterson ("Patterson") stopped Defendant for following too closely on Interstate 75 and exceeding the speed limit by two miles an hour. After Defendant

pulled over, Patterson sought consent to search Defendant's car and Defendant consented. During the search, an officer found a loaded Firestar .45 semi-automatic firearm hidden in the engine compartment. The occupants of the vehicle, including Defendant, were then handcuffed and read the *Miranda* warnings. The encounter was recorded without audio in some portions, but Defendant's consent to search and his *Miranda* warnings were recorded.

After Defendant acknowledged his rights, Officer Carl Maskew ("Maskew") arrived on the scene and questioned Defendant about the firearm. Although Defendant denied knowledge of the firearm on the scene, he contacted Maskew the next day. Defendant offered to cooperate with law enforcement and, after being read his *Miranda* warnings once again, admitted to buying the firearm discovered during the traffic stop. This interview was recorded. Defendant was provided a cell phone by the ATF to use during his cooperation.

Over a year later, in November 2010, Detective Dale Taylor ("Taylor") was investigating a number of similar robberies he suspected were being perpetrated by the same individual. During these robberies, the individual would enter a location where a female employee worked by herself, grope her, and then force her to lay on the floor during the robbery. During one such robbery, stamps were stolen from the East Lake Post Office. Police later received a tip from a confidential informant stating Defendant was selling stolen stamps. The informant solicited incriminating statements from Defendant in a recorded phone call, but Defendant denied any involvement in the robbery.

In a subsequent robbery, a cell phone was stolen from a female victim. Taylor compared the phone numbers dialed on the stolen phone with the numbers dialed by Defendant on his ATF-provided phone. Both phone records showed calls to Defendant's wife, girlfriend, and mother's

employer.  Taylor, whose suspicions were now focused on Defendant, concluded Defendant fit the description of the suspect and noted Defendant had a criminal history that included multiple robberies.  In April 2011, after this evidence was discovered, Taylor decided to place a GPS device on Defendant's car while it was parked on a public street.  He did so on April 22, 2011.

At the suppression hearing before Judge Lee, Taylor was unsure whether he had probable cause to obtain an arrest or search warrant at this point in his investigation.  On cross examination he suggested he did not believe the phone records were enough to support a search warrant, but on redirect seemed to suggest he did have enough evidence to support a warrant.  Regardless, Taylor did not obtain a search warrant to place the GPS device on Defendant's car.  Instead, he obtained approval within the Chattanooga Police Department.  This instance was the first and last time Taylor used such a device on a suspect's vehicle.  He testified at the suppression hearing he was using the GPS device only as a substitute for physical twenty-four hour surveillance, which he otherwise would have used.  No evidence was presented by either party to suggest Defendant's vehicle ever went onto private property.

Each day, Taylor would receive a report of locations where Defendant's vehicle stopped.  After the device was placed on Defendant's vehicle, a store was robbed in which a female victim was forced to remove her shirt, groped, and had items stolen from her, including jewelry.  After Taylor determined this robbery matched the *modus operandi* of the suspect in the previous robberies, he reviewed Defendant's GPS information and discovered Defendant's vehicle had stopped two hundred feet from the store during the course of the robbery.  Turning the GPS onto a "live feed" mode, where it would show Defendant's current location and movements, Taylor informed officers of Defendant's location.  When officers arrived, Defendant admitted to possessing marijuana.

Officers then arrested Defendant, and found jewelry belonging to the victim on his person. Once in police custody, and after signing a *Miranda* waiver, Defendant denied robbing the store but claimed he received the items in exchange for giving an individual a ride from the location earlier in the night.

Either during the course of this interview or after review of the GPS tracking information, Taylor determined Defendant visited his mother's house after the robbery. Defendant also admitted to helping Roderick Jennings ("Jennings") move. Police obtained consent from Defendant's mother to search her residence and located a ski mask, gloves, a cell phone, and two semiautomatic handguns. Many of these materials, including one of the guns, matched clothing and items worn and used during the course of the robbery. Police also sought a consensual search of Jennings' residence, which was initially provided by his wife but later revoked before the search began. After obtaining a search warrant, police recovered ammunition and clothing similar to what was worn during some of the robberies. Police later interviewed Jennings, who linked Defendant to over twenty-five robberies.

Defendant was initially charged in a four-count indictment. A seventeen-count superseding indictment charges Defendant with additional counts of crimes charged in the original indictment and some additional charges. Defendant filed motions to suppress evidence obtained from the 2009 traffic stop and evidence obtained from the GPS tracking device. After Judge Lee recommended Defendant's motions be denied, Defendant filed thirteen objections to her R&R.

## II.    STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objection is made, 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court rehear

witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting her in the best position to determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## III. <u>DISCUSSION</u>

Defendant makes thirteen objections to the R&R, however many of the objections are redundant. The Court will split Defendant's objections into two groups: objections to Judge Lee's findings regarding the 2009 traffic stop, and objections to her findings regarding the GPS tracking device.

### 1. 2009 Traffic stop

#### a. Validity of the stop

Defendant's first four objections essentially argue the same point. Defendant objects to (1) Judge Lee's conclusion the 2009 stop was supported by probable cause and was reasonable because Defendant committed a traffic infraction, (2) her conclusion the initial stop was lawful, (3) her conclusion Patterson actually stopped Defendant for following too closely, and (4) her contention that subjective intent of an officer is irrelevant in determining lawfulness of the stop. Important to both Judge Lee's determination and the Court's review, Defendant does not dispute he was in fact following too closely (Court File No. 70, p. 12 n.13). Rather, Defendant argues the infraction was pretext for the stop, which actually occurred because of Defendant's race.

The Fourth Amendment protects individuals from, *inter alia*, unreasonable searches and

seizures. U.S. Const. amend. IV. Although "[s]topping and detaining a motorist 'constitute[s] a seizure' within the meaning of the Fourth Amendment . . . [, a]n officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "Probable cause exists if facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains* , 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). Defendant does not dispute he actually committed the traffic violation on which Patterson based the 2009 traffic stop. *See* Tenn. Code Ann. § 55-8-124(a). Because it is undisputed Patterson observed Defendant following too closely, the Court concludes Patterson had probable cause to conduct the traffic stop and **DENIES** Defendant's first and second objections.

Defendant also argues the stop is unlawful because the violations were pretextual; Defendant believes he was actually stopped because of his race. The law is well settled that subjective motivations of law enforcement are immaterial in the Fourth Amendment context. *Whren v. United States*, 517 U.S. 806, 812-13 (1996); *United States v. Everett*, 501 F.3d 484, 488 (6th Cir. 2010) (citing *Whren*, 517 U.S. at 813); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Indeed, the Court in *Whren* considered the implications of race selective police stops and concluded such motivations were irrelevant to a Fourth Amendment analysis. *Whren*, 517 U.S. at 813 ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.

Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").[1] Accordingly, the Court **DENIES** Defendant's third and fourth objections.

### b. Voluntariness of Defendant's consent to the search

Defendant's next five objections contest Judge Lee's determination the search of Defendant's vehicle performed after the 2009 traffic stop was lawful. Defendant contends (5) the search was not voluntary, (6) the length and nature of the stop suggest consent was coerced, (7) Judge Lee should not have considered Defendant's experience with the justice system in her determination, (8) the government did not meet its burden to establish voluntariness of the search, and (9) the search was unlawful. Although styled as five separate objections, the objections amount to an assertion the search was not voluntary and any obtained consent was coerced. As a result, Defendant argues, the search was unlawful and the resulting evidence should be suppressed.

To determine if consent to a search was "voluntary or was the product of duress or coercion, express or implied," the Court must look at the "totality of the circumstances." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (internal quotations omitted). "Among the relevant circumstances to be scrutinized are the defendant's [age], lack of education or low intelligence, the lack of any warnings regarding the accused's constitutional rights, as well as evidence of duress or coercion, such as, deprivation of food or sleep and prolonged detention or questioning." *United*

---

[1] Defendant's first motion to suppress did allege the circumstances of the stop raised "equal protection questions." However, the Equal Protection Clause is not mentioned in the R&R or Defendant's objections. This omission is understandable because the Sixth Circuit has made clear the exclusionary rule does not apply to violations of the Equal Protection Clause. *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008) ("[W]e are aware of no court that has ever applied the exclusionary rule for a violation of the Fourteenth Amendment's Equal Protection Clause and we decline Nichols's invitation to do so here. Rather, we believe the proper remedy for any alleged violation is a 42 U.S.C. § 1983 action against the offending officers."), *overruled on other grounds as recognized in United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011).

*States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988); *but see United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (explaining that while "the defendant's knowledge of his right to refuse consent is a factor, [] the government need not prove that the defendant had such knowledge to establish that consent was voluntary"). Indeed, courts have distinguished between situations in which searches were obtained during a consensual encounter as opposed to an "unreasonably prolonged *Terry* detention." *United States v. Tuggle*, No. 10-20042-ML/P, 2010 WL 5856037, at *6 (W.D. Tenn. December 30, 2010). "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. . . [and it] will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

At the suppression hearing, the recorded encounter between Defendant and Patterson was submitted into evidence. During the course of the traffic stop, Patterson asked Defendant if he had been in any trouble in the past, to which Defendant answered truthfully that he had. Patterson then asked Defendant whether there were any drugs, large amounts of currency, or guns in the car, and Patterson requested consent to search the vehicle. Defendant told him to "go ahead," and after Patterson sought clarification Defendant was consenting to a search, Defendant said "yes" because he had not done "anything wrong" (Court File No. 70, p. 2). Defendant offered no evidence on this point either at the suppression hearing or in conjunction with his objection to the R&R.

Defendant's only argument regarding the coerciveness of the search appears to be the lengthy nature of the traffic stop, which left Defendant and his passengers on the road for longer than an hour. However, the consent was given early in the course of the traffic stop, at 8:40 on the video (Government's Exhibit 1), and the subsequent time spent searching the vehicle does not render the initial consent involuntary. *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807,

830 (6th Cir. 2007) (holding consent to a search was not coerced when it was given twenty-five minutes into a stop that eventually lasted three hours). When Patterson sought consent to search the vehicle, Defendant unequivocally granted it, claiming he had nothing to hide. Because the recording of the stop showed clear consent to the search and nothing coercive, and no evidence suggests Defendant is of particularly low intelligence or is otherwise susceptible to police coercion, the Court finds the government met its evidentiary burden to establish voluntary consent. Further, as to Judge Lee's offhand discussion of Defendant's criminal history, a court may consider experience with the criminal justice system when determining whether consent to a search was voluntarily given. *See, e.g.*, *United States v. Bradley*, 163 F. App'x 353, 356-57 (6th Cir. 2005) (including a defendant's criminal history and familiarity with criminal law in its voluntariness analysis); *United States v. Fisher*, 27 F. App'x 558, 561 (6th Cir. 2001) ("This defendant, though young, had considerable prior experience with the legal system—a circumstance that bears on the extent of her knowledge and thus on the voluntariness of her consent."); *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (considering the defendant was a "sophisticated and experienced criminal" in its voluntariness determination). Because consent was voluntarily given, the search was lawful. The Court **DENIES** Defendant's fifth, sixth, seventh, eighth, and ninth objections.

### c. Voluntariness of Defendant's statements

In Defendant's tenth objection, he argues the statements he provided to police the day following the traffic stop were not voluntarily or knowingly made and they should be suppressed.[2]

---

[2] Defendant's objection appears to confuse the dates involved in the case. It argues statements on April 15 and 16 should be suppressed. However, the traffic stop in this case occurred on April 14 and the parties agreed Defendant made no incriminating statements on that day (Court File No. 70, p. 3). Defendant volunteered to cooperate with law enforcement the following day, April 15, which is when the statements in controversy were made. No statement appears to have

Judge Lee concluded the statements were voluntary and knowing, as evidenced by Defendant twice receiving *Miranda* warnings, verbally acknowledging he understood the first warning, and nodding when asked if he understood the second.

The Fifth Amendment protects a person from being compelled to incriminate him or herself. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self incrimination. *Miranda*, 384 U.S. at 467-68. Because of the pressures and psychological stress exerted on those in custody, officers of the law are required to adequately and effectively apprise such individuals of their rights and must fully honor their decision should they seek counsel before answering questions. *Id.* at 467. If an individual agrees to answer questions without counsel, the officer can then question the individual freely. *Davis v. United States*, 512 U.S. 452, 458 (1994). The government bears the burden of establishing a waiver by the preponderance of the evidence. *United States. v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)). A "waiver of *Miranda* rights must be voluntary, that is, 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *Id.* Such a waiver must also be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud v. Davis*, 618 F.3d 525, 529 (6th Cir. 2010) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

As an initial matter, the Court notes Defendant has not alleged any coercive police activity in his first motion, at the suppression hearing, or in his objections to the R&R. The law is settled that a defendant must allege some coercive activity before a court will find the confession

been made on April 16.

involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *Cowans v. Bagley*, 639 F.3d 241, 249 (6th Cir. 2011) ("[Defendant] did not allege any government overreaching, which is fatal to his claim of involuntariness.") (citing *Connelly*, 479 U.S. at 169-70). Because Defendant has not alleged any coercive activity, the Court finds the April 2009 confession was voluntary.

The government still bears the burden to demonstrate the second prong of the waiver analysis; that is, that the waiver was knowing and intelligent. To establish a valid waiver, "[a]n express written or oral statement is not required." *Treesh v. Bagley*, 612 F.3d 424, 433 (6th Cir. 2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Silence alone is not sufficient, but "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* (citing *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262 (2010)). Courts have found affirmative nods sufficient to establish waiver. *See United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) ("[H]ead nods have been found to express consent."); *United States v. Villegas*, 928 F.2d 512, 519 (2d Cir. 1991).

The Court finds Defendant knowingly and intelligently waived his Fifth Amendment rights. There is nothing to suggest Defendant is of low education, low intelligence, or was otherwise confused regarding the *Miranda* warnings. Defendant heard the *Miranda* warnings twice in a period of twenty-four hours. During the course of the traffic stop, Defendant was advised of his rights and verbally acknowledged he understood them. Subsequently, when he approached law enforcement the following day, Defendant was again read his rights and Maskew, the interviewing officer, stated,

11

"I just want to make sure you understand [those rights]. Okay, are you clear on that?" Defendant nodded his head and expressed his desire to cooperate with law enforcement. Defendant's only argument the confession was not voluntary is the insufficiency of a head nod to establish waiver. However, as noted, head nods have been found sufficient to establish waiver. Further, Defendant had verbally acknowledged his rights the night before. Defendant then made an uncoerced statement to law enforcement. Accordingly, the Court **DENIES** Defendant's tenth objection.

### 2. GPS tracking device

Defendant's final three objections all relate to the GPS tracking device placed on his car in 2011. Judge Lee concluded, based on the recent decision in *United States v. Jones*, 132 S. Ct. 945 (2012), Taylor violated Defendant's Fourth Amendment rights when he attached the GPS device to Defendant's vehicle. Going a step further than the Court in *Jones* was called to do, Judge Lee concluded attaching the device without a warrant was unreasonable under the Fourth Amendment regardless of whether Taylor had probable cause or a reasonable suspicion of wrongdoing. However, Judge Lee concluded the exclusionary rule should not be applied to improperly acquired pre-*Jones* GPS evidence. Defendant objects to Judge Lee's conclusions (11) the exclusionary rule should not apply; (12) Taylor's conduct did not show a deliberate, reckless, or grossly negligent disregard for Defendant's Fourth Amendment rights; and (13) the application of the good-faith exception in this case was in line with precedent. Although listed as separate objections, Defendant essentially asserts the exclusionary rule should be applied to the GPS tracking information in this case. The government did not object to the R&R, but its response to Defendant's objections urges the Court to adopt the R&R on the ground attaching a GPS device to a vehicle with probable cause does not require a warrant.

The Court agrees with Judge Lee's conclusion a Fourth Amendment violation occurred. In *Jones*, police obtained a warrant to attach a GPS device on the defendant's vehicle, which was only valid for ten days and required police execute it in the District of Columbia. Eleven days after the warrant was issued, police attached a GPS device to the defendant's car while it was parked in Maryland. Because the warrant was violated, the defendant filed a motion to suppress. The government argued, although the warrant was violated, no Fourth Amendment violation occurred because the installation of the GPS device was not a "search" within the meaning of the Fourth Amendment. The defendant's "reasonable expectation of privacy" was not invaded, the government contended, because they merely monitored his movements on public roads. The Court rejected this argument because, in addition to the expectation-of-privacy test established by *Katz v. United States*, 389 U.S. 347 (1967) and its progeny, the Fourth Amendment still protects individuals from trespassory invasions of property. *Jones*, 132 S. Ct. at 952 ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."). Because police committed a physical trespass on the defendant's vehicle to attach a GPS device, as was done in this case, they conducted a "search" within the meaning of the Fourth Amendment. *Jones*, 132 S. Ct. at 949. However, the government in *Jones* forfeited the argument that, even without a valid warrant, the search was supported by probable cause and was reasonable under the Fourth Amendment. *Id.* at 954. The Court is called to answer that question here.

"[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989). What is reasonable "depends on all of the circumstances surrounding a search or seizure and the nature of the search or seizure itself." *Id.* "'Where a search is undertaken by law enforcement officials to

discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant,' which, in turn, ordinarily requires a 'showing of probable cause.'" *Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 698 (6th Cir. 2011) (quoting *Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)). However, the government in this case argues a lesser standard should apply to the attachment of GPS devices under the Fourth Amendment "totality of the circumstances" test. Under that test, a court determines the reasonableness of a search by balancing "the degree to which it intrudes on an individual's privacy and, . . . the degree to which it is needed for the promotion of legitimate government interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quotations and citations omitted).

Both prongs of the totality of the circumstances test weigh in favor of applying the traditional warrant requirement to GPS tracking device cases. With regard to the privacy prong, the *Jones* Court did not focus its analysis on the privacy invaded by the attachment of a GPS device to a suspect's vehicle. Rather, the Court concluded the physical trespass committed against a suspect's property was sufficient to incur Fourth Amendment scrutiny. *Jones*, 132 S. Ct. at 949. In light of *Jones*, whatever diminished privacy interest a suspect has on the exterior of his vehicle still counsels in favor of traditional Fourth Amendment protection. Further, GPS tracking as a class has the potential to report a suspect's movements on private property, which is typically protected from government surveillance. *See United States v. Karo*, 468 U.S. 705, 715 (1984). Second, with respect to the government's legitimate interests, no government interest compels a lesser standard in GPS tracking cases. In fact, because tracking will usually occur in preliminary investigation stages, as happened in this case, there is simply no reason a warrant could not be obtained prior to placing a GPS device on a suspect's vehicle. Indeed, the government in *Jones* had obtained a

warrant, but violated its requirements. *Jones*, 132 S. Ct. at 948. The Court concludes the traditional warrant requirement is appropriate in GPS cases.

The government apparently did not extensively argue the search here fell into the automobile exception of the warrant requirement, opting instead to argue the above-rejected lesser standard should apply in GPS cases. A search may be performed without a warrant if it falls into one of the exceptions to the warrant requirement, such as the automobile exception. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). Although at first blush the automobile exception may seem appropriate in this case, the exception is premised on two considerations: the natural exigency of the automobile, in that it can move at any time and take with it suspected evidence, and the lesser expectation of privacy a driver has in his car compared with a home or office. *Id.* (citing *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). The Court finds neither premise supports the automobile exception's application here. The natural exigency of ready mobility is not implicated in this case because Taylor placed the device on Defendant's car to see where he was going, not because he believed contraband was inside. *See United States v. Ortiz*, – F. Supp. 2d –, 2012 WL 2951391 (E.D. Penn. July 20, 2012). Further, because *Jones* was premised on the property-based protection afforded by the Fourth Amendment rather than the privacy-based approach, 132 S. Ct. at 949-50, the automobile exception's privacy rationale is inapplicable here. Because the exception is inappropriate in this case, law enforcement must obtain a warrant to place a GPS device on a suspect's vehicle. Here, Taylor did not obtain a warrant and he therefore violated Defendant's Fourth Amendment rights.

Although the Court concludes Defendant suffered a Fourth Amendment violation, the Court must determine whether the resulting evidence obtained as fruits of the search should be excluded

from trial. In order to properly enforce the Fourth Amendment, which itself contains no means of enforcement, the courts have established an exclusionary rule that "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139-40 (2009). The exclusionary rule does not apply as a matter of course following a Fourth Amendment violation, but is "our last resort, not our first impulse." *Id.* at 140 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The exclusionary rule is not a personal right or a means to redress constitutional injury; rather, it is used to deter future violations. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011); *Herring*, 555 U.S. at 141. Deterrence alone is insufficient to justify the exclusionary rule, because "the benefits of deterrence must outweigh the costs [of excluded evidence]," such as "letting guilty and possibly dangerous defendants go free." *Herring*, 555 U.S. at 141; *see also Davis*, 131 S. Ct. at 2426. In keeping with this principle, the exclusionary rule generally applies where "police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights," but not "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Davis*, 131 S. Ct. at 2427.

The Supreme Court has held an officer's reliance on binding precedent at the time of the search or seizure, even if the precedent is later overruled, satisfies the good-faith exception to the exclusionary rule. *Davis*, 131 S. Ct. at 2426. In *Davis*, police reliance on binding federal appellate precedent was "objectively reasonable," and the "absence of police culpability doom[ed] Davis's claim." *Id.* at 2428. If, as the Court had previously held, reliance on a later invalidated warrant, *United States v. Leon*, 488 U.S. 897 (1984),[3] or statute, *Illinois v. Krull*, 480 U.S. 340 (1987), would

---

[3] Reliance on a later-invalidated warrant satisfies the good-faith exception unless the magistrate was intentionally misled by an affiant, the magistrate wholly abandoned his judicial role to such an extent no reasonably well trained officer would rely on the warrant, or the warrant is "so

not incur the exclusionary rule, neither should invalidated precedent. "Responsible law-enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to those rules." *Id.* at 2429. But where binding precedent authorizes a practice, officers will rely on the decision, and "act as a reasonable officer would and should act under the circumstances." *Id.* (quotations omitted).

Further, even where law enforcement itself is at fault, such as where police rely on erroneous information in a database maintained by their own employees, the good-faith exception applies if the negligence precipitating the mistake was isolated and nonrecurring. *Herring*, 555 U.S. at 137. In *Herring*, the Court explained "abuses that [give] rise to the exclusionary rule feature[] intentional conduct that [i]s patently unconstitutional." 555 U.S. at 143. Because the mistake in *Herring* was isolated, the Court concluded "the conduct at issue was not so objectively culpable as to require exclusion." *Id.* at 146. Rather, to suppress evidence, "the deterrent effect of suppression must be substantial and outweigh any harm to the justice system." *Id.* at 147. Isolated negligent conduct is simply insufficient to meet that standard. *Id.*

Because the violation here occurred pre-*Jones*, the parties' primary dispute is the application of *Davis*. The Sixth Circuit did not rule on the GPS tracking device issue prior to *Jones*, although several circuits had, including four that upheld warrantless tracking,[4] and one that foresaw the *Jones* decision and concluded warrantless attachment of a GPS device violated the Fourth Amendment.[5]

---

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 488 U.S. at 923.

[4] *United States v. Hernandez*, 647 F.3d 216 (5th Cir. 2011); *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010); *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007); *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999).

[5] *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010).

As such, there was no *binding* precedent on which Taylor could reasonably rely pursuant to *Davis*, but there were other circuits who had concluded his conduct was lawful.[6] Whether law enforcement's reliance on non-binding precedent in other circuits satisfies the good-faith exception has split a number of district courts facing the warrantless GPS device issue, with some concluding such reliance satisfies the good-faith exception,[7] and others holding it does not.[8] This is the central question before the Court.

From Defendant's perspective, allowing law enforcement to rely on non-binding precedent limits the reach of the Fourth Amendment and provides an incentive to police to engage in questionable police practices.[9] *See United States v. Lee*, No. 11–65–ART, 2012 WL 1880621, at *9 (E.D. Ky. May 22, 2012) ("[E]xtending the good-faith exception would give police 'little incentive to err on the side of constitutional behavior.'") (quoting *Davis*, 131 S. Ct. at 2435 (Sotomayor, J., concurring)); *United States v. Katzin*, No. 11–226, 2012 WL 1646894, at *9-10 (E.D. Pa. May 9, 2012) ("[O]pening to the Government the shelter of the good faith exception in this case would encourage law enforcement to beg forgiveness rather than ask permission in ambiguous

---

[6] But he could only rely on three cases, rather than four, because *United States v. Hernandez*, 647 F.3d 216 (5th Cir. 2011) was decided after the conduct at issue.

[7] *See e.g.*, *United States v. Baez*, No. 10-10275-DPW, 2012 WL 2914318, at *1 (D. Mass. July 16, 2012); *United States v. Leon*, No. CR 09–00452 JMS, 2012 WL 1081962, at *4–5 (D. Haw. Mar. 28, 2012).

[8] *See e.g.*, *United States v. Lee*, No. 11–65–ART, 2012 WL 1880621, at *6–10 (E.D. Ky. May 22, 2012); *Ortiz*, 2012 WL 2951391, at *1; *United States v. Lujan*, No. 2:11CR11–SA, 2012 WL 2861546, at *3 (N.D. Miss. July 11, 2012); *United States v. Katzin*, No. 11–226, 2012 WL 1646894, at *9-10 (E.D. Pa. May 9, 2012).

[9] Defendant provided very little argument on this point beyond relying on *Lee*, 2012 WL 1880621, a decision on the same issue currently before the Court by another district court in the Sixth Circuit.

situations involving basic civil rights."). The downside to limiting *Davis* to binding precedent, on the other hand, is low. After all, such a holding does little more than put law enforcement in the position it was before *Davis*, where it had to carefully choose its techniques and scrupulously respect Fourth Amendment rights for fear of the exclusionary rule.

From the government's perspective, circumscribing the good-faith exception to binding precedent unduly limits *Davis* and *Herring*, which focus on deterring culpable police action. Allowing police to rely on non-binding appellate precedent accounts for the culpability inquiry of the good-faith exception, because if, as occurred here, a panel of judges on four appellate circuits believed the action was constitutional, and only one concluded otherwise, the police activity can hardly be called a "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights." *Davis*, 131 S. Ct. at 2427; *see also id.* at 2428 ("Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"). Limiting *Davis* to binding precedent could also have the unintended effect of making law enforcement officers "unduly cautious in pursuing investigatory initiatives." *United States v. Baez*, No. 10-10275-DPW, 2012 WL 2914318, at *8 (D. Mass. July 16, 2012). That consequence must be factored into the costs visited upon the judicial system by the application of the exclusionary rule.

The Court believes the government has the better argument. Defendant's points are well taken, and indeed the Court believes there may be some instances of police reliance on non-binding precedent that do not satisfy the good-faith exception. However, the Court believes a rule limiting

*Davis* to binding precedent ignores the underlying rationale in *Davis* and *Herring*.[10]  The Court did not simply hold law enforcement acted reasonably by relying on binding law, but also acknowledged the officer's reasonable reliance rendered his conduct inculpable.  *Davis*, 131 S. Ct. at 2427 ("The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue.") (quoting *Herring*, 555 U.S. at 143).  The costs imposed on the judicial system by the exclusionary rule outweigh the value of deterrence when police conduct is not culpable.  *Davis*, 131 S. Ct. at 2429; *Herring*, 555 U.S. 147-48; *see also United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) ("The Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'") (quoting *Herrin*g, 555 U.S. at 141).

The question for the Court is whether Taylor's action was such a deliberate, reckless, or grossly negligent disregard of Fourth Amendment rights the value of deterring it outweighs the costs to the judicial system of excluding the resulting evidence.  *See Davis*, 131 S. Ct. at 2427; *Herring*, 555 U.S. at 143; *see also Master*, 614 F.3d at 243.  Taylor's actions here do not meet that standard.  Although the year before Taylor attached the device one circuit court concluded such activity

---

[10] The Court is aware, before *Davis*, the Sixth Circuit anticipated *Davis*'s holding and concluded the exclusionary rule is inappropriate when police rely on binding precedent, but stressed "our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation." *United States v. Buford*, 632 F.3d 264, 276 n.9 (6th Cir. 2011) (quoting *United States v. Davis*, 598 F.3d 1259, 1266 (11th Cir. 2010)).  However, the Court believes the thrust of the "unequivocal" language in *Buford* is to dissuade law enforcement from constructing legal rationales based on cases analyzing supposedly analogous practices and arguing reliance on untested legal theories satisfies the good-faith exception.  The court in *Buford* was not confronted with the question of relying on non-binding precedent in other jurisdictions where that precedent dealt explicitly with the practice in controversy.

required a warrant, the previous consensus of three federal circuit courts[11] considered the activity lawful. Reliance on non-binding precedent may not always be reasonable,[12] but the Court concludes Taylor's reliance on three out of four federal circuits to hear the GPS tracking device issue was reasonable. In light of the *Davis* and *Herring* decisions, Taylor's conduct was insufficiently culpable to justify excluding the evidence he later obtained. Accordingly, Defendant's eleventh, twelfth, and thirteenth objections are **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 70). Defendant's motions to suppress will be **DENIED** (Court File No. 41, 59).


**An Order Shall Enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

---

[11] In *United States v. Hernandez*, 647 F.3d 216 (5th Cir. 2011), the Fifth Circuit joined the majority of pre-*Jones* circuits and concluded attaching a GPS device to a vehicle without a warrant was not a search within the meaning of the Fourth Amendment. However, it did so after Taylor attached the GPS device to Defendant's car.

[12] The court in *Lee*, 2012 WL 1880621, at *8, rejected an argument similar to the Court's conclusion because it raised too many questions, such as "[h]ow many circuits must support a practice before an officer can rely on it in good faith?" However, the Court concludes the exclusionary rule landscape has been altered by *Davis* and *Herring* and case-by-case analysis is now the intended standard. *Master*, 614 F.3d at 243 (concluding *Herring* created a balancing test that must be applied to every case before excluding evidence). On the circumstances of this case, the Court believes Taylor's reliance on four federal appellate courts was reasonable.